## Bertha Schipper v. George P. Schipper.

1.  DIVORCE—*Extreme and Repeated Cruelty—Sufficiency of Evidence.* —The court discusses the sufficiency of the evidence of cruelty as contained in the record; finds the same sufficient and directs the court below to enter a decree for complainant.

**Memorandum.**—Bill for divorce. Appeal from a decree dismissing complainant's bill rendered by the Superior Court of Cook County; the Hon. PHILIP STEIN, Judge, presiding.  Heard in this court at the October term, 1894.  Reversed with directions.  Opinion filed December 20, 1894.

APPELLANT'S BRIEF, ARCHIBALD M. TAYLOR, ATTORNEY.

Legal cruelty is that which may endanger the life or health of the party, received by one and caused by the other of the married parties. Warring v. Warring, 2. Phil. 136; 1 Eng. Ecc. 210, 211.

The danger and suffering, as a cause for divorce, may exist either in realization or in apprehension; it may be suffering of either body or mind rendering cohabitation dangerous or unendurable. Kennedy v. Kennedy, 73 N. Y. 369; Wheeler v. Wheeler, 53 Iowa 511; Morris v. Morris, 14 Cal. 76; Beyer v. Beyer, 50 Wis. 254; Poor v. Poor, 8 N. H. 307; Elmes v. Elmes, 9 Pa. 166; Westmeath v. Westmeath, 2 Hagg. Sup. 1; Evans v. Evans, 4 Eng. Ecc. 310.

An attempt on the life of the complaining party is legal cruelty and is a cause for divorce. Ill. Rev. Stat. 1880, 422.

Indignities may be a cause for divorce. They are a species of cruelty, but rather to the mind than to the body. Gordon v. Gordon, 48 Pa. St. 226; Lewis v. Lewis, 5 Mo. 278; Haley v. Haley, 44 Ark. 429.

If a husband charge his wife with crime, for the purpose of making her suffer, it is cruelty. Kennedy v. Kennedy, 73 N. Y. 369.

The wife will not be forced to live and cohabit with a husband when her life and safety are endangered by his conduct. The court is not to wait until the hurt is done. Mahone v. Mahone, 19 Cal. 526; Holden v. Holden, 4 Eng. Ecc. 452; Lockwood v. Lockwood, 7 Eng. Ecc. 114; Johns v. Johns, 57 Mo. 530; Moyler v. Moyler, 11 Ala. 620; D'Aguiler v. D'Aguiler, 3 Eng. Ecc. 329; Beebe v. Beebe, 10 Iowa 133.

A husband frequently drunken, who chokes his wife, coarsely accuses her of unchastity, and threatens to smash her head with a brick, is guilty of such inhuman conduct as endangers her life. So repeated applications of coarse epithets to a wife, accompanied once by actual bodily harm, and once by a threat to take her life, was held to be cruelty. Wheeler v. Wheeler, 53 Iowa 511; Freeman v. Freeman, 31 Wis. 235; Tyrell v. Tyrell, 2 Cent. Rep. 219; Coursey v. Cour-

sey, 60 Ill. 186; Wilcox v. Wilcox, 16 Ill. App. 580; Sharp v. Sharp, 16 Ill. App. 348; Campbell v. Campbell, 27 Ill. App. 309; Harman v. Harman, 16 Ill. 90; Farnham v. Farnham, 73 Ill. 497.

M. R. HARRIS, attorney for appellee.

MR. JUSTICE SHEPARD DELIVERED THE OPINION OF THE COURT.

The appellant sued for a divorce on the ground of extreme and repeated cruelty, and for alimony, and the custody of her children.

The cruelty was denied by the answer of appellee, and it was further set up by him by way of defense, that the appellant deserted him, and that because of misconduct on her part she was not a fit custodian of the children.

The parties were married February 3, 1886, and lived together as husband and wife until November 24, 1893, when the appellant left her husband, because, as alleged in the bill, of specified acts of cruelty committed by him upon her, and took their two children with her.

On the day appellant went away she left for or sent to her husband the following letter:

"CHICAGO, ILL., November 24, 1893.

GEO.: No doubt you were surprised when you went home at noon to find us gone, but you see we have taken you at your word and have left you in peace with no hard feelings towards you whatever, for I have forgiven you for all your blows and harsh words, but I just made up my mind yesterday when you told me to take my two young ones and go that I would, and as you see I have. I have taken nothing but what belonged to me and I think I divided nearly equally with you, at least I hope I did as I don't want nothing that does not belong to me. We are now in the city but will only remain till 7.30 to-night when we leave and I hope for good. I suppose you will say she can't make an honest living for herself and two children, but I will promise you this much, that my boy and girl will *never*

Schipper v. Schipper.

have cause to blush for their mother, for I shall be faithful to them, for I love them both dearly. I suppose you will think there is a second party to blame for this step, and there is where you are right, for you have Sallie and Belle, John and Minnie to blame for me doing as I have done, for I have seen for a long time that you believed any of them before you did me; and now if they will treat you better than I did, why you are free to go to them, and if you think Sallie will make you a better wife than I have done, why I will give you your freedom.

I hope you and her will be happy, and as for Min and John, why they are beneath my notice. Of course you have been influenced in your actions, but you should have had a mind of your own and not listened to all they wanted to tell you, for you know as well as I do that all they told you was a pack of lies, but that is all past now and I will not reproach you for what you have done. I shall not let the children forget you, for you are their father and I wish them to remember you. Well, I must close as my time is short. Hoping this will reach you all right I will bid you *goodby*.

Yours respectfully,

BERTIE SCHIPPER.

The leaving of the appellee by the appellant, at the time mentioned in the foregoing letter, is the desertion that is set up in the appellee's answer, and testified to by him.

Of the marriage, two children were living at the time the cause was heard, one a boy then seven years old, and the other a daughter aged four years.

On the hearing, the bill was dismissed for want of equity, and the complainant appeals to this court from that decree.

During the time of the trouble between the parties they lived in South Chicago, where the appellee clerked in a dry goods store, and where, during a part of the time the appellant taught music, and rented rooms to lodgers, in aid of the household and family expenses, which there is evidence tending to show were not adequately provided for by appellee.

The parties appear to have lived together without any serious trouble until about a year before the wife left.

What provocations existed to create the feeling that then sprung up on the part of the husband does not clearly appear. It seems rather by indirection than by positive evidence that he became jealous of her and suspicious of her conduct; that he looked upon her giving music lessons and keeping roomers as subterfuges to enable her to see men other than her husband at times when he was not present, and that such differences and disputes arose in consequence as led to the attacks and assaults which she testified to.

However that may have been, the record does not contain such evidence of misconduct on the part of the wife as to even measurably justify his conduct as testified to by her.

According to her testimony, his first blow was in the latter part of 1892 or beginning of 1893, when he struck her on the cheek so violently as to knock her down upon the bed.

The next occasion was two or three weeks later, when he slapped her in the face. On the next occasion, in March, 1893, he raised a carving knife over his head and said: "God damn you, if you open your mouth again I will cut your throat from ear to ear." In July, 1893, he slapped her in the face, knocked her on the bed and there choked her, until interrupted by a servant girl. Again, in October, 1893, he raised a chair above his head and threatened to strike her with it, and was interrupted by one of their roomers.

Again, about November 1, 1893, he choked her and struck her, drawing blood from her nose, and was interfered with by a roomer.

At another time in the same month he slapped her in the face and knocked her head against the door.

And on November 23d, the day before she left him, he struck her again and knocked her against a picture that fell upon her, and told her he did not want to see any more of her; and later, on the same day, said to her: "Take your

two young nuisances and get to hell; I don't want anything more to do with either of you."

Such is in substance a very brief statement of her narrative of his physical cruelty to her. We have omitted in most instances the violent language which she testified to as accompanying the attacks. As related by her, the occasions for the disputes, ending in violence, were, if not of a trivial character, such as by no means warranted such treatment of her.

At least three of the attacks were witnessed by persons who testified to them in behalf of appellant, one of whom, the servant girl, testified that when she heard the cries of the appellant, she went into their bedroom and saw him choking her, and that the marks of his hands upon her throat remained for two days; and another, the roomer, who interfered with him at the time he choked and struck her, on November 1st, testified that he saw him then choke her and strike her in the face. This same witness testified, also, with reference to the assault with the chair, that he saw it, and that appellee swung the chair over his shoulder and said: "It would do me good at this time to kill you;" and that, on the day following one of those occasions, he remonstrated with the appellee concerning his conduct to his wife, telling him that such conduct would lead to a divorce, and that appellee's answer was: "If I thought slapping her would lead to a divorce and furnish grounds for a divorce, I would go back and slap her again."

The appellee denied, in his testimony, the specific acts of cruelty and each of them, which were testified to by the appellant, including those that were corroborated by other witnesses as well as those that were not; and called witnesses who testified that they never observed anything but amicable relationship between the parties.

He also testified to, and was in some respects corroborated by the testimony of other witnesses, that the appellant was not at all times a diligent housekeeper, nor at all times altogether discreet in her conduct as a married woman.

But there was nothing shown by the testimony of any

witness that seriously affected her character as a virtuous and good woman, and her absence from home and leaving some of the household duties to a servant who was employed after she began to give music lessons, are entirely consistent with her explanation that it was because of her necessary absences in that pursuit. Mere insinuations are not entitled to the dignity of being called evidence.

The question, therefore, recurs almost solely to the single issue of whether the charge of cruelty, extreme and repeated, within the meaning of the statute, was made out by the appellant.

It can not be successfully questioned but that treatment, such as the appellant testified to, if not denied, would constitute a sufficient showing of extreme and repeated cruelty within the meaning of the statute, as interpreted many times by the courts of this State. The mere reading of appellant's testimony is enough for that, to any person familiar with the adjudications.

As already recited, she is corroborated by apparently reliable witnesses in the instances of three of the acts of violence committed upon her, and corroboration as to them tends strongly in support of the truthfulness of her narrative of the other acts to which she testified.

We have looked with much care to discover in her testimony any elements of unreliability by her as a witness, but without success.

The mere fact that she testified that the letter already quoted, sent by her to her husband after she left him, had been changed by the omission, or in some way striking out, of two words, "to hell," after the word "go" in the first paragraph, where she states what he told her to do with herself and two children, when it is clearly apparent from an inspection of the original letter accompanying the record that the letter remains exactly as written, should not be counted too heavily against her. It was her intention to repeat in her letter the words he had used to her, and in the belief that she had done so, her statement that the letter had been changed, when in truth it had not been, was

rather an illogical mental result than the statement of a fact obviously untrue to her eyes when testifying.

More serious misstatements are not infrequent by witnesses whose integrity does not thereby become seriously impaired. But if it were a false statement it was entirely immaterial. Whether after she left him she wrote that he told her to " go " merely, or to " go to hell," is not at all material to the question of whether or not it was true that he had cruelly treated her before she left him.

And being immaterial, it should not of itself alone seriously impair the credit to be given to her testimony on material points.

In no other respect, except by the denial of the appellee, is the credibility of her testimony called in question, and he denies with as much positiveness the acts witnessed by others and corroborated by their testimony, as he does those acts which find support in her testimony alone.

We think, under such circumstances, that the mere denial by the appellee of the specific acts testified to by the appellant, corroborated in three separate instances, can not prevail.

The appellant was entitled upon the evidence to a decree of divorce, and upon the whole record it was error to dismiss the bill.

The record contains a statement by counsel, not contradicted, that the children were, at the time of the hearing, outside of the jurisdiction of the court, but within the mother's control, and as they are of an age rendering them more suitable to supervision by the mother than by the father, and as the subject is one over which the court below may well retain jurisdiction, we will make no express directions concerning the same.

And on the question of alimony the record is too deficient to predicate a decree upon.

The decree of the Superior Court will, therefore, be reversed, with directions to that court to enter a decree finding that the appellee has been guilty of extreme and repeated cruelty to the appellant, and granting to appellant a divorce

from the appellee; and in the decree to reserve the subjects of the custody of the two children and of alimony for further consideration, whenever, upon a further showing of circumstances or conditions, it shall see fit. Reversed with directions.